IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARC KARDELL,

        Plaintiff,

    v.

LANE COUNTY, LIANE DAVIS, and
ALEX GARDNER,

        Defendants.
_____

Case No. 6:13-cv-736-MC

OPINION AND ORDER

MCSHANE, Judge:

Before me are several motions filed by the parties following a March 7, 2019, jury verdict in favor of plaintiff Marc Kardell with respect to his retaliation claims against defendants Lianne Davis and Lane County. Defendant Alex Gardner, as a prevailing party, moves for an award of costs against Kardell. ECF No. 192. Davis and Lane County move for Judgement as a Matter of Law, arguing that the evidence did not support the verdict. ECF No 205. Finally, Kardell moves for attorney fees and costs against Davis and the County, along with pre and postjudgement interest. ECF NO. 197, 221, 202, and 207 . As the parties are well-aware of the facts and proceedings in this 6-year-old action, I only include below the facts relevant to the pending motions.

## DISCUSSION

### 1. Gardner's Motion for Costs

The jury found Gardner did not violate Kardell's First Amendment rights. Gardner, as the prevailing party on Kardell's claims against him, moves for $6,235.00 in costs. ECF No. 192. Gardner seeks $20 in docket fees, $350 in filing fees, $5,157.02 in deposition transcript costs, and $707.98 in copying fees. Kardell does not dispute any of the specific costs sought, arguing instead that because he prevailed on his claims against the two other parties, he is the prevailing party in this action and Gardner is not entitled to any costs. Kardell points to no cases supporting his theory that because he prevailed on his claims against other defendants, Gardner is not a prevailing party as to Kardell's claims against him.

For example, Kardell points to *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1347 (Fed. Cir. 2006) for the proposition that "The fact that a party does not prevail on all of its claims does not, however, preclude it from being the prevailing party for purposes of awarding costs under Rule 54(d)." The lone defendant in *Kemin Foods*, however, argued that because the plaintiff there prevailed on only one of its two patent infringement claims against it, the defendant was in fact the prevailing party under rule 54. *Id.* Here, Kardell prevailed on no claim against Gardner. Therefore, as to Kardell's claims against Gardner, Gardner is the prevailing party and is entitled to costs. Kardell does not challenge any of the specific costs sought and, in any case, Gardener's requested costs are all allowable under 28 U.S.C. § 1920. Gardner is awarded $6,235.00 in costs.

### 2. Liane Davis and Lane County's Motion for Judgment as a Matter of Law

As noted, the jury found that Liane Davis and Lane County retaliated against Kardell in violation of his First Amendment rights. In moving to set aside that verdict, Davis and Lane

County face a high bar. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (noting that "[t]his high hurdle recognizes that credibility, inferences, and factfinding are the province of the jury, not this court."). The Court "can overturn the jury's verdict and grant such a motion only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 149 (2000)). The Court may not weigh the evidence and must draw all inferences in favor of the non-moving party. *Id.* Finally, I must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* (quoting *Reeves*, 530 U.S. at 151).

To prevail on his First Amendment claims, Kardell had to establish three elements: (1) that he spoke on a matter of public concern; (2) that he spoke as a private citizen and not as a public employee; and (3) that his protected speech was a substantial or motivating factor in the defendant's adverse employment actions. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). While the Court is still somewhat puzzled as to what exactly Kardell complained of when he spoke with HR, I believe that most of this confusion stems from Kardell's rather odd way of communicating. In his declarations submitted at summary judgment, and later confirmed in his testimony at trial, Kardell manages to use a lot of words and phrases while often leaving the listener or reader in the dark as to what he is attempting to communicate. Kardell's own attorney acknowledged this trait at trial: "And I recognize that Mr. Kardell's communication style was perhaps not the most clear. I recognize that." ECF No. 214, 143.

What is beyond dispute is that everyone who heard Kardell's complaints believed he was primarily concerned with whether he was under investigation. Kardell acknowledged in his testimony that this was in fact his primary concern in going to HR:

3 – OPINION AND ORDER

> Q. Okay. You mentioned earlier that when you met with Mr. Vorhees and Ms. Hayes you had some concern that maybe you had been investigated too. Did you raise that with human resources in January 2012?
>
> A. I did. I thought that was new information to them, and I was aware of the requirement that if you are a whistleblower you need to bring new information. And I thought that what had happened to me, being somebody that worked closely with a lot of the board members, that if they saw that I had been investigated but that nothing had come of it, maybe they would start to look at these other investigations regarding the board members that were in the minority because it was the majority that was authorizing, essentially, her actions, that if they knew that it was going after other people as well, maybe they'd take another look at that and do something to kind of put some bookends around what it was she was doing.
>
> Q. So that's my next question. What was it that you were asking HR to do about all of these concerns you had?
>
> A. *I was asking, first of all, to take a look at what happened with regards to me*, and then if there was anything there, report those issues to the board and that if the result was what I believed it to be, that there should be somebody else signing off or doing something with her investigations so she wasn't just initiating these investigations on and on into the future.

ECF No. 218-1, 20-21 (emphasis added).

Both of the HR employees who met with Kardell testified that while they were generally confused about the nature of Kardell's complaints, they understood that his main concern was whether he was, or had been, under investigation. "And his main concern was he felt in some way that he was part of this investigation that involved Mike McKenzie-Bahr, and wanted to know about that investigation and his involvement, and the outcome of the investigation and all of those things." ECF No. 215, 37. "But it really felt more like it was about him personally, and how he was feeling in the office, and how he was feeling about the work and his environment, relationships, things like that. ECF No. 25, 40. "I don't know, it almost seemed like in the meetings, there was almost—Mr. Kardell was all over the place. Like I said, we tried to nail him down. It was like this big conspiracy theory. I'm part of this investigation, even though we told

4 – OPINION AND ORDER

him he wasn't part of the investigation. And then there was these other things that came along. And we were trying to answer those, and then how do we move forward. Because really what I saw was communication issues in the workplace." ECF No. 215, 42-43.

Regardless of the confusing fashion in which Kardell voiced his concerns, everyone agrees that Kardell refused to believe he had not been under investigation. Ironically, Kardell—who complained about Davis's costly and baseless investigations—demanded a costly and baseless investigation into whether he had been under investigation. If the above was the totality of the evidence presented, Kardell did not in fact speak on a matter of public concern.

However, the question here is whether any evidence supports the verdict. This First Amendment action presents an odd scenario where roughly 90% of Kardell's speech related to a purely personal concern, while perhaps 10% of his speech touched on matters of a public concern. There is testimony in the record, from Kardell and HR, that Kardell mentioned the issue regarding the procurement card. This testimony finds support in HR notes from the meeting and emails following the meeting. The gist of that complaint is that Kardell informed HR that Davis mentioned the possibility of initiating an investigation into a County employee's improper use of a County credit card. Davis told Kardell that should the employee apply for a job Davis coveted, she would raise the issue to the Board of Commissioners. This speech—where a County administrator held the threat of investigations over those who opposed her (in policies or in competition for a sought after position)—rises to a level of public concern. As argued by Kardell's attorney during arguments at the close of Kardell's case-in-chief, "Standing alone, that P-card issue is a matter of public concern. It's a threat, it's a misuse of power to penalize a political opponent." ECF No. 214, 149. And while it is clear that this was not the main thrust of

Kardell's comments to HR, the evidence demonstrates that he raised the issue, however obliquely, to HR.[1]

One next asks whether Kardell spoke as a private citizen or as a County employee. To prevail on a First Amendment claim, Kardell must have spoken as a private citizen. Unlike the public concern prong, this prong is not a purely legal question. This was a question for the jury to decide. I note that this presents a fairly close question. After all, in a seemingly routine workplace conversation, Kardell learned that another County employee might have information that another employee was misusing a County credit card.[2] It would appear that the typical reaction for nearly any employee (whether a public or private employee) would be to take that matter to one's supervisor or, as Kardell in fact did, to HR. This is not a case where a public employee took an issue to the local newspaper. Instead, Kardell took the issue to HR, where he piggybacked the complaint in what appears to be a rather offhand manner onto his more vociferous complaint that he was subject to an improper investigation. That said, Kardell testified, and in fact went out of his way to constantly repeat, that HR "was not in my chain of command and I knew of no duty to take such a concern to HR." Despite the general question the

---

[1] Testimony at trial clearly demonstrated everyone involved believed Kardell to complain mainly of his own alleged investigation and, to a lesser extent, the investigation of the board members. This is true not only as to the HR employees, but with respect to Gardener's and Davis's view of Kardell's complaints. While one stray contemporaneous note referenced the procurement card complaint, it is beyond clear that the main thrust of Kardell's concerns involved his own investigation. Even at trial, Kardell testified mainly to his own alleged, albeit nonexistent, investigation.

[2] As Kardell repeated literally tens of time at trial, he believed he had "unique insights" into Davis's investigations due to his own work with one of the department heads Davis investigated. Because Kardell was incapable of clearly communicating his insights, the Court, HR, and Gardner are left somewhat in the dark here. Regardless, it appears clear that Kardell gained any insights through his role as a County attorney. This points to the conclusion that Kardell spoke on the investigations as a public employee, not as a private citizen.

6 – OPINION AND ORDER

Court has of where else one would take such information, the jury apparently credited Kardell's testimony that he had no duty to take information about possible misuse of County funds to HR.[3]

Finally, Kardell must establish that Davis took an adverse employment action against him, and that such action was motivated by his protected speech to HR about the procurement card issue. Nearly overwhelming evidence demonstrated that well before Kardell spoke to HR, the County commissioned a report on how to streamline or update the County Counsel's office. The evidence indicated Kardell and Vorhees were expensive attorneys with minimal usefulness. There was evidence that Kardell frustrated multiple agencies because he refused, or was simply unable, to keep his opinions to legal issues as opposed to political issues. There was evidence that shortly before being terminated, Kardell committed gross insubordination by publicly challenging his supervisor's staffing decisions.[4]

But the Court's duty post-verdict is not to weigh the evidence. Instead, I must inquire as to whether any evidence supported the jury's verdict that Davis retaliated against Kardell because he spoke out about the procurement card issue. Although this evidence somewhat pales in comparison to the evidence of office restructuring that pre-date Kardell's meetings with HR, it nonetheless exists. For example, evidence demonstrated that for over ten years, Kardell received exemplary reviews. In fact, he received good marks mere days before he first spoke to

---

[3] It bears repeating that the Court wonders here where Kardell believes he should have taken the information that a County employee was potentially misusing county funds. Surely a County attorney who learns of potential misuse of a County issued credit card would have to report that information. And in the Court's view, HR is the place to take such information. As noted, the jury apparently concluded otherwise. Additionally, the Ninth Circuit's earlier ruling at least implies that a public employee who learns of potential misuse of authority in the course of his public employment, speaks as a private citizen by taking the information to HR.

[4] Kardell's email, demonstrating remarkably poor judgment by a county attorney, was practically grounds for termination on its own. It is no surprise that shortly after that email, Davis again recommended terminating Kardell's position. Somewhat surprisingly (at least to this Court), Kardell was able to convince the jury that Davis's email was not in fact a response to Kardell's earlier lack of judgment, but instead retaliation for Kardell's complaints to HR.

7 – OPINION AND ORDER

HR. Then, within a month or two of his meeting with HR, multiple departments stated they no longer wished to work with Kardell. Many of these departments worked under, or reported to, Davis. Evidence demonstrated HR relayed Kardell's concerns to Gardner, who relayed those concerns to Davis.[5] Evidence suggested the head of HR and Davis had a mutually supportive relationship. Evidence supported Kardell's theory that despite defendants' claim that the County was in a dire financial predicament, Davis sought a large raise shortly after Kardell's termination. Kardell presented an email from Davis where she specifically suggests eliminating Kardell's position. Ex. 122. Davis signed the Reduction in Force, which officially eliminated Kardell's position. Ex. 184. After Kardell was terminated, the County changed the Administrative Procedures Manual to provide recall rights not for any same or lower classified position, but only for similarly classified positions. This change meant Kardell was not considered for the new position the County posted after terminating Kardell. This evidence supports Kardell's theory that Davis learned of his comments to HR and only then decided to move towards eliminating Kardell's position. Again, while the evidence fairly convincingly demonstrated that Davis knew only of Kardell's comments regarding his own investigation, Kardell did raise, however briefly, the procurement card issue with HR. There exists at least the inference that HR relayed that matter of public concern to Davis, and that Davis initiated the elimination of Kardell's position.

The above information, viewed in the light most favorable to Kardell, supports the jury's verdict. Davis argues there was no evidence that she was the final decisionmaker with respect to terminating Kardell. That may well be so. But an adverse employment action is not limited to a

---

[5] Once again, the evidence strongly indicated Gardner and Davis were informed that Kardell was inquiring into his own investigation, as opposed to any matter of public concern.

termination. As noted above, there was evidence that Davis sent an email recommending Kardell be terminated. Ex. 122. And, evidence suggested that Davis requested departments reporting to her not work with Kardell. Reducing the usefulness of an attorney like Kardell, who was now severely limited in who he could work for, could itself be an adverse employment action.[6]

### 3. Kardell's Motion for Fees and Costs

Kardell moves for $533,574.25 in attorneys' fees. Marianne Dugan and Cindy Danforth, who represented Kardell through the Court's ruling granting defendants' original motions for summary judgment, seek to recover for 632.1 hours for a total of $210,356.25. Angeli Law Group, who took over the case on appeal, seek to recover 1410.9 hours for a total of $323,218.00. The specific breakdown of hours and fees consists of:

| NAME | ROLE | RATE | HOURS | FEES |
|---|---|---|---|---|
| Benjamin Soude | Attorney, Appeal 2014-15 | $350 | 45.1 | $15,785.00 |
| Colin Hunter | Attorney, Trial 2017-19 | $300 | 314.8 | $94,425.00 |
| Colin Hunter | Attorney, Appeal 2014-17 | $250 | 167.4 | $41,850.00 |
| Ursula Lalovic | Research Attorney 2018-19 | $200 | 521.8 | $104,225.00 |
| Cheryl Oakley | Paralegal 2018-19 | $185 | 361.8 | $66,933.00 |
| **Angeli Law Group Subtotal** | | | **1410.9** | **$323,218.00** |
| Marianne Dugan | Attorney Trial 2013-14 | $375 | 276.3 | $103,616.25 |
| Cindy Danforth | Attorney Trial 2013-14 | $300 | 355.8 | $106,740.00 |
| **Total** | | | **2043** | **$533,574.25** |

---

[6] This evidence that Davis was the authorized decisionmaker in regard to limiting Kardell's ability to work with various departments, or that she signed the reduction in force, supports the jury's verdict against Lane County.

9 – OPINION AND ORDER

Kardell also seeks $22,139.74 in nontaxable costs, along with $11,505.07 in taxable costs.

Kardell argues that the sheer length and complexity of this case justifies the 2000-plus hours of attorney work on this matter. Although this case took six years to get to trial, it was not complex. This was a garden-variety employment discrimination case. The ultimate issues were neither complex nor novel: what did Kardell speak about, and how did the defendants retaliate against him? Kardell tended to confuse matters simply because over the course of six years, including through his own testimony on the stand, he was utterly incapable of clearly articulating what he complained about. As demonstrated above, the evidence clearly demonstrates that when Kardell spoke to HR, he was mainly concerned with whether he was under investigation. It was essentially only in passing that he mentioned anything related to the procurement card issue. While Kardell complained about Davis's investigations, most of those complaints were related to the non-existent investigation he considered himself a victim of. Similarly, to the extent he complained of investigations of board members, those investigations were the subject of previous news reports. Kardell merely stated, in his usual oblique manner, that he had "unique insights" to these investigations because he performed legal work for the department under investigation. In fact, his "unique insights" were related to his conspiratorial complaint that he too was under investigation.

Again, there was nothing complex about this case. Despite Kardell's attempts at litigating every single positive employee review over the course of a decade, and his attempt at litigating every perceived office slight (from another county employee calling him a "dick" to Davis's refusal to allow Kardell to contribute to a retirement cake to people listening in on Kardell's

private office conversations), the actual evidence for the jury to consider was exceedingly straightforward: what did Kardell complain about and what did defendants do after Kardell complained?

Despite spending over 2000 hours on this case, the Court was left with the impression that Kardell lacked any clear theory of his case; choosing instead a shotgun approach of throwing a lot of theories at the jury in the hopes that something stuck. This practice, not confined to trial, became evident during the original summary judgment briefings and arguments. At trial, Kardell submitted nearly 300 proposed exhibits. Despite the sheer volume of exhibits (most of which were Kardell's employee reviews or post-termination applications for other jobs), it became clear at trial that only perhaps 25 exhibits, in the form of emails, were actually relevant to Kardell's theory.[7] Other than those emails, Kardell only relied on a few pages of handwritten HR notes. Additionally, most of Kardell's proposed witnesses were slated to testify about Kardell's usefulness as an attorney. While the number of exhibits and witnesses would, intentionally or not, confuse the jury, the actual evidence was neither complex nor voluminous. Again, relative to most disputes in federal court, there was nothing complex about this case.[8]

---

[7] The Court understands there were thousands of pages of discovery provided to Kardell, including at least 14,000 pages at the time of the original summary judgment oral argument. But as demonstrated by the emails relied on by Kardell at trial, very few of those pages were relevant to Kardell's claims. An experienced attorney billing upwards of $300 per hour would be able to quickly sift through the discovery and focus on the important documents.

[8] Kardell also complicated matters by needlessly fighting for any available instruction, regardless of whether the facts or law supported the instruction in this particular case. This complicated matters, and confused the Court and opposing counsel as to Kardell's actual theory of the case. For example, Kardell fought for every available instruction on municipal liability, including a ratification instruction (apparently alleging HR discriminated against Kardell and Davis ratified those HR decisions) and a pattern and policy instruction (apparently alleging the fact that Davis initiated three investigations meant that Lane County has an ingrained, unwritten, *de facto* policy of conducting baseless investigations). The evidence simply did not warrant either instruction. An attorney that specializes in 1983 law and bills at $300 per hour, and spent over 800 hours of attorney and research time on this case, would not have advanced such theories.

11 – OPINION AND ORDER

At the initial motion for summary judgment, Kardell complicated matters by dumping nearly 500 pages of exhibits into the record, along with a nearly 30-page declaration outlining the toxic nature of Davis's tenure. In fact, at that stage, Kardell relied nearly entirely on his April 2012 email to the board in support of his First Amendment claims. Demonstrating counsel's own confusion at the theory and claims, at oral argument, counsel for Kardell explicitly stated he did not rely on the comments to HR for his First Amendment claims. ECF No. 96, 10 ("I also wanted to clarify that the earlier discussions with Ms. Zike, which were about Mr. Kardell's concerns about Liane Richardson, **that's a separate issue, and we are not claiming that as part of the First Amendment claim. That is part of the—that is the whistle-blowing claim**.") (emphasis added). Of course, the jury ultimately found for defendants on the whistleblowing claim and, in contrast with counsel's statement at summary judgment, relied entirely on Kardell's statements to HR in finding for Kardell on his First Amendment claims against Davis and Lane County. Kardell's apparent confusion as to the theory supporting his case, especially at summary judgment, is all the more remarkable when considering counsel had spent over 600 hours on this action and, as specialists in 1983 claims, request $375 and $300 per hour.

It was clear to the Court, and confirmed by the Ninth Circuit, that Kardell's April 2012 email to the board was not a matter of public concern. That was the gist of Kardell's argument at summary judgment on the First Amendment claims. Additionally, Kardell argued at summary judgment that his termination violated his procedural due process rights. The evidence and corresponding arguments on Kardell's due process claim were, to a very large extent, irrelevant to his First Amendment claims. The procedural due process claim focused on Kardell's alleged right to a pre-separation hearing and subsequent right to be recalled. Very little of this claim is wound up in the common factual nucleus relating to his First Amendment claims. Despite not

12 – OPINION AND ORDER

prevailing on these issues, neither Dugan nor Danforth make any reduction in their requested hours during this time period. In light of the above, and in light of the rather shocking request for over 2000 hours of work on this case, mostly by experienced attorneys (with corresponding hourly rates), the Court is tasked with considering a reasonable number of hours expended on this case.

The Ninth Circuit applies the "lodestar" method for calculating attorney fees. *Fischer v. SJB–P. D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000). That calculation multiplies a reasonable hourly rate by the number of hours reasonably expended in the litigation. *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933 (1983). A "strong presumption" exists that the lodestar figure represents a "reasonable fee," and it should therefore only be enhanced or reduced in "rare and exceptional cases." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986). Ordinarily, the court decides whether to enhance or reduce the lodestar figure by evaluating a set of factors. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).

Prevailing market rates are those that the local legal market would pay for a case of this nature to a lawyer of comparable skill, experience, and reputation to a plaintiff's counsel of record. *Blum v. Stenson,* 465 U.S. 886, 897 (1984). Accordingly, this District uses the Oregon State Bar 2017 Economic Survey as the initial benchmark when reviewing fee petitions.[9] I conclude the hourly rates sought are reasonable but, as shown below, the number of hours when viewed in light of the hourly rates are unreasonable.

---

[9] The economic survey is available at https://www.osbar.org/_docs/resources/Econsurveys/17EconomicSurvey.pdf.

13 – OPINION AND ORDER

A plaintiff who prevails on some claims may not recover on "unrelated claims" based on different legal theories not "involve[ing] a common core of facts[.]" *Hensely v. Eckerhart*, 461 U.S. 424, 435 (1983). Here, Kardell did not survive summary judgment on his procedural due process claim. This claim, based on his alleged right to a pre-separation hearing and the right to be recalled, relied on a different core of facts than the retaliation claim. The retaliation claims relied, to a great extent, on events occurring up to the date of Kardell's termination. The due process claim relied nearly entirely on events after the termination. That claim relied on an entirely different legal theory than the retaliation claims. Kardell's time logs for the relevant time period contain insufficient detail to allow the court to parse out the time spent on the unsuccessful due process claim, and Kardell does not even attempt to account for this time. I conclude 20% of Dugan and Danforth's time was spent on the due process claim. As Dugan and Danforth requested 632.4 hours, a 20% deduction for time spent on the unsuccessful due process claim reduces their hours to 505.92.

As described above, the Court must determine not only a reasonable hourly rate, but the number of hours reasonably spent on the litigation. I conclude 505.92 hours spent by Dugan and Danforth are not reasonable. Dugan and Danforth worked on this case through the original round of summary judgment. Following the Court's ruling for defendants on those motions, counsel for Davis and Lane County moved for an award of fees. ECF No. 85. At that stage, outside counsel for Davis and Lane County expended 232.30 hours on the case, with an additional 26.20 hours of work from a legal assistant. ECF No. 85, 3. In-house counsel during that time period spent an additional 136.4 hours on the case, followed by another 276.8 hours of paralegal time. In total, counsel for Davis and Lane County spent 368.7 hours of attorney time and 303 hours of paralegal time on the matter.

14 – OPINION AND ORDER

In finding over 500 hours of attorney time is unreasonable, I note that Dugan and Danforth seek high hourly rates of, respectively, $375 and $300 per hour. The high hourly rates, justified by their years of expertise working on civil rights matters, necessarily mean that they can perform legal work faster (i.e., more efficiently) and more proficiently than lower priced counsel. Yet here, Dugan and Danforth seek to have it both ways; they request a high hourly rate yet also request nearly 30% more attorney hours than defense counsel spent defending the claims.[10] While I recognize Dugan and Danforth apparently did not utilize the services of a paralegal (or lower priced attorney) to do any clerical tasks, I still conclude 505.92 attorney hours spent through summary judgment is unreasonable given: (1) the requested hourly rates; and (2) that fact that this was not a particularly complex case. Given the above, I conclude a further 25% reduction in hours is appropriate. I conclude Dugan is entitled to 165.78 hours (276.3 hours reduced by 20% = 221.04 hours reduced by 25% = 165.78 hours) at $375/hour for a total of $62,167.50 and Danforth is entitled to 213.48 hours (355.8 hours reduced by 20% = 284.64 hours reduced by 25% = 213.48 hours) at $300/hour for a total of $64,044.00.

The Angeli Law Group seeks to recover for the following hours.

| NAME | ROLE | RATE | HOURS | FEES |
|---|---|---|---|---|
| Benjamin Soude | Attorney, Appeal 2014-15 | $350 | 45.1 | $15,785.00 |
| Colin Hunter | Attorney, Trial 2017-19 | $300 | 314.8 | $94,425.00 |
| Colin Hunter | Attorney, Appeal 2014-17 | $250 | 167.4 | $41,850.00 |
| Ursula Lalovic | Research Attorney 2018-19 | $200 | 521.8 | $104,225.00 |

---

[10] This is after the 20% reduction the Court deducted for work on the due process claim.

15 – OPINION AND ORDER

| Cheryl Oakley | Paralegal 2018-19 | $185 | 361.8 | $66,933.00 |

      The Angeli Law Group spent less time working on unsuccessful claims. The ultimately unsuccessful whistleblowing claim was based on essentially identical facts and law as the successful retaliation claims. That said, the requested hours seem excessive under the circumstances. On remand, the summary judgment proceedings were essentially a renewal of the earlier motions. The requested hours match the Court's view that Kardell's attorneys consistently seemed to overwork or needlessly complicate the case. Again, the ultimate issues were not complex: what did Kardell complain about and what did defendants do after learning of his complaints? Yet Kardell wanted to delve deeply into each and every perceived office slight. Kardell consistently stated the Court should set aside at least two weeks for this case. Ultimately, the jury began deliberations on the fourth day of trial.

      As noted, Kardell submitted nearly 300 proposed exhibits. Few of them were relevant and it took the court two days to work through the objections. At trial, Kardell ended up relying on approximately 25 exhibits (mostly emails and handwritten notes). The brevity of the trial reflected the simplicity of the issues. I applaud the Angeli Law Group for utilizing a cheaper research attorney to conduct much of the research. But considering that Colin Hunter spent over 300 hours after the Ninth Circuit opinion, and considering he spent 167 hours on the appeal, the Court is left pondering how many of the additional 521 research hours in this garden-variety employment discrimination case were "reasonable." After all, discovery had closed years before, and all of the legal issues were fully briefed during the first round of summary judgment. Of course a new attorney has to get up to speed, but at some point Colin Hunter's $300 per hour rate

must reflect the fact that hundreds of additional hours of research on a standard employment discrimination case might be overkill.[11]

To summarize, the Angeli Law Group's hours appear bloated. Perhaps the hours would be justified with a lower hourly rate. But at the requested rates, the amount of hours, and especially the amount of research hours, are unreasonable. One solution is to accept the requested hours but reduce the hourly rate. The Court opts for a second option, accepting the hourly rates but somewhat reducing the hours (by finding the requested hours unreasonable). I conclude the fees of Colin Hunter and Benjamin Soude are reasonable when reduced by 25%. Therefore, Benjamin Sounde may recover for 33.84 hours at $350 per hour for a total of $11,838.75. Colin Hunter may recover for 236.1 hours at $300 per hour and 125.55 hours at $250 per hour for a total of $102,217.50. Given the above, and once again noting that this action did not present complex or novel issues, I conclude 300 of the 521.8 requested hours of the research attorney are reasonable. At $200 per hour, that comes to $60,000. I conclude all of the 361.8 paralegal hours are reasonable. At $185 per hour, that comes to $66,933. I conclude plaintiff's additional fees of $22,148.00 and $4,067.35 in costs incurred litigating the request for fees, the motion for prejudgment interest, and opposing Davis's and Lane County's motion for judgment as a matter of law are reasonable.

Kardell also moves for nontaxable costs of $22,139.74. The Court reviewed these items as detailed in exhibit three of Hunter's declaration at ECF No. 198. All of these out-of-pocket costs appear to be those of the sort that "are typically charged to paying clients by private attorneys." *Davis v. City and Cty. of San Francisco*, 976 F.2d 1536, 1556 (9th Cir. 1992)

---

[11] The Court recognizes additional research is of course necessary following summary judgment. The question is at what point such additional research becomes unnecessary.

17 – OPINION AND ORDER

(vacated on other grounds in *Davis v. City and Cty. of San Francisco*, 984 F.2d 345, 345 (9th Cir. 1993)). Those costs are therefore properly incorporated into the award of attorney's fees. *Id.*

Finally, Kardell moves for $11,505.07 in costs.[12] ECF No. 202. Defendants make no specific objections, and the costs are allowable under 28 U.S.C. § 1920.

4. **Kardell's Motion for Prejudgment and Postjudgment Interest**

The parties agree that postjudgment interest is mandatory and that the appropriate rate under 28 U.S.C. § 1961(a) is 2.52%. The parties disagree on the rate of prejudgment interest and the date such interest runs. Generally, the postjudgment rate of interest is presumed to be the appropriate rate of prejudgment interest. *Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984) (prejudgment rate set at postjudgment rate unless substantial evidence demonstrates "that the equities of the particular case require a different rate."). The equities do not justify a deviation in this instance. As noted by Kardell, the 2.52% rate is only slightly higher than Lane County itself received on its conservative investments over the past 18 years. A 2.52% prejudgment rate does not qualify as a "windfall" for Kardell. Instead, the rate adequately compensates him for the lost time value of the money awarded by the jury for his damages.

Davis and Lane County argue that prejudgment interest should run not from the date of termination—i.e., when Kardell's claims accrued—but from the date the 9th Circuit remanded the case to this Court. This argument is meritless. While it is true that Kardell did not prevail on

---

[12] As noted, Kardell is entitled to an additional $4,067.35 in costs incurred post-verdict.

18 – OPINION AND ORDER

all the claims he originally brought, he prevailed on two retaliation claims that accrued, at the latest, on the date he was terminated. "Prejudgment interest is a measure that 'serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.'" *Schneider v. Cty of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002) (quoting *West Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987)). As Kardell's claims accrued on May 4, 2012, that is the appropriate date on which Kardell is entitled to be compensated for the loss of use of the damages awarded by the jury.

Kardell is entitled to prejudgment interest of 2.52%, compounded annually, as of May 4, 2012. The parties agree that the computation comes out to prejudgment interest of $18,464.26 against Davis and $18,464.26 against Lane County.

## CONCLUSION

Gardner is awarded $6,235.00 in costs. Davis and Lane County's Motion for Judgment as a Matter of Law is DENIED. Kardell is awarded $389,348.75 in attorney's fees, as detailed above. Kardell is awarded post judgment interest at 2.52% and prejudgment interest of $18,464.26 against Davis and $18,464.26 against Lane County. Kardell is awarded $15,572.42 in costs and $22,139.74 in nontaxable costs.

IT IS SO ORDERED.

DATED this 25th day of July, 2019.

                                            _____/s/ Michael McShane_____
                                                    Michael McShane
                                          United States District Judge